Matthew J. Fink (*Pro Hac Vice* Forthcoming)
Amy Collins Cassidy (*Pro Hac Vice* Forthcoming)
Christopher D. Blum (*Pro Hac Vice* Forthcoming)
NICOLAIDES FINK THORPE
MICHAELIDES SULLIVAN LLP
10 South Wacker Drive, Suite 2100
Chicago, IL 60606
Ph:  312-585-1400
Fax: 312-585-1401
mfink@nicloaidesllp.com
acassidy@nicolaidesllp.com
cblum@nicolaidesllp.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aspen Specialty Insurance Company, a North Dakota corporation, | No. _____ |
| Plaintiff, | |
| v. | |
| Closed Loop Refining and Recovery, Inc., an Arizona corporation, | COMPLAINT AND JURY DEMAND |
| Defendant. | |

## COMPLAINT

Aspen Specialty Insurance Company ("Aspen"), for its Complaint against Defendant Closed Loop Refining and Recovery, Inc. ("Closed Loop"), states as follows:

## NATURE OF ACTION

1.      Aspen seeks rescission of insurance policies it issued to Closed Loop because the policies were issued in reliance on fraudulent, material misrepresentations by Closed Loop.

2.      Had Aspen known the true facts regarding Closed Loop's outdoor storage of crushed leaded glass, speculative accumulation of cathode ray tubes ("CRTs") in warehouses in Arizona and Ohio, and on-going failure to contain lead dust within its facilities – all in violation

of environmental regulations and at issue in several undisclosed enforcement actions by state and federal agencies – Aspen would not have issued the policies to Closed Loop.

## THE PARTIES

3.     Aspen is a North Dakota corporation with its principal place of business in New York.  Aspen is a citizen of the states of New York and North Dakota.

4.     Closed Loop is a defunct corporation that was previously incorporated in Arizona, and its last principal place of business was in Phoenix, Arizona.  Closed Loop is a citizen of the state of Arizona.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant is a resident of Arizona, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions at issue occurred in this District.

7.     An actual justiciable controversy exists between and among the parties that can be determined by an order of this Court.

## FACTUAL BACKGROUND

**I.     Closed Loop Begins Accumulating CRTs in 2010.**

8.     Starting in 2010, Closed Loop accepted large quantities of CRTs for recycling.

9.     Closed Loop's clients paid Closed Loop to accept CRTs for recycling.

10.    At all relevant times, Closed Loop knew that recycling such large quantities of CRTs was not feasible using existing downstream furnaces which, according to Closed Loop, were

"shutting down left and right" due to the decline in demand for CRTs.  (Exhibit 1.)

11.     Closed Loop told its clients that the two remaining furnaces that accepted glass from North America were expected to cease operations by 2013.

12.     As a result, Closed Loop represented to its clients and to regulators that it would recycle the CRTs using a proprietary glass furnace.

## II.     Closed Loop Begins Storing Unboxed CRTs Outside, and Speculatively Accumulating CRTs, by 2012.

13.     Closed Loop stored the CRTs it received in and around various facilities in Arizona and Ohio.

14.     Closed Loop knew at all relevant times that it was required to store the CRTs in compliance with state and federal regulations.

15.     Closed Loop knew at all relevant times that state and federal regulations required that Closed Loop store the CRTs (and processed CRT glass) inside a building or a closed container that is properly labeled.

16.     One applicable federal regulation, 40 C.F.R. § 261.39, explains that the purpose of the storage requirement is "to minimize releases to the environment of CRT glass (including fine solid materials)."

17.     By 2012, Closed Loop began storing processed CRT glass in uncovered piles and containers outside at least one of the warehouses it rented, located at 435 S. 59th Ave, Phoenix, Arizona.

18.     Aerial photographs publicly available on the website of the Maricopa County Assessor's Office (https://mcassessor.maricopa.gov/) show that the piles of uncovered CRT glass outside 435 S. 59th Ave, Phoenix, Arizona grew in 2013, 2014, and 2015, and remain in place (at least as of the most recent photograph in 2018) (Exhibit 2).

19.     Closed Loop knew at all relevant times that state and federal regulations required that CRTs not be "speculatively accumulated."

20.     A material is *not* speculatively accumulated if:  (1) the material is potentially recyclable and has a feasible means of being recycled; and (2) 75% of the material on site on January 1 is recycled, or transferred to a different site for recycling, in the calendar year.

21.     By 2012, Closed Loop was storing CRTs and processed CRT glass that:  (1) had no feasible means of being recycled; and (2) 75% of which was not recycled, or transferred to a different site for recycling, in the calendar year.

**III.     The Ohio EPA Cites Closed Loop for Violations Including Storing CRTs Outside in 2013.**

22.     On September 30, 2013, the Ohio Environmental Protection Agency ("Ohio EPA") inspected Closed Loop's facility at 1675 Watkins Road, Columbus, Ohio.

23.     On October 17, 2013, the Ohio EPA issued a notice of violation letter (Exhibit 3) to Closed Loop, finding that Closed Loop had committed "violations of Ohio's hazardous waste laws" including by storing 300 pallets of broken CRTs outside in deteriorated cardboard gaylords (pallet-sized cardboard boxes), and storing 450 pallets of intact CRTs outside, some of which had broken due to storage conditions.

24.     The Ohio EPA's October 17, 2013 notice of violation letter also reminded Closed Loop of its obligations under the speculative accumulation laws.

25.     On June 10, 2014, Closed Loop entered into an Expedited Settlement Agreement and Director's Order (the "Settlement Agreement," Exhibit 4) with the Ohio EPA to forego further enforcement action.

26.     The Settlement Agreement formalized the Ohio EPA's findings, including its determination that CRTs stored in improperly maintained cardboard boxes "had been 'released' to the parking lot and the ground."

**IV.     The Arizona DEQ Cites Closed Loop for Violations Including Speculative Accumulation and Storing CRTs Outside in 2014.**

27.     On August 6, 2014, the Arizona Department of Environmental Quality ("Arizona DEQ") conducted an inspection of a Closed Loop facility in Phoenix, Arizona.

28.     The August 6, 2014 inspection led the Arizona DEQ to issue Closed Loop a notice of violation letter on October 3, 2014 (Exhibit 5), citing four code violations relating to the improper storage and accumulation of CRTs.

29.     The Arizona DEQ's October 3, 2014 Notice of Violation documented Arizona DEQ officers' observation of processed lead CRT glass that Closed Loop had been accumulating for three years (*i.e.*, since 2011).

30.     The Arizona DEQ later notified Closed Loop, in a letter dated December 11, 2014 (Exhibit 6), that it intended to pursue a Consent Order relating to the violations cited in its October 3, 2014 notice of violation letter.

31.     The Consent Order states that the Arizona DEQ determined Closed Loop violated 40 CFR § 261.39(c) relating to the treatment, storage, or disposal of hazardous waste.

32.     The Consent Order states that Closed Loop "failed to…transfer to a different site for recycling, at least 75 percent by weight or volume of the amount of the processed leaded CRT glass during the calendar year."

33.     Closed Loop later entered into the Consent Order with the Arizona DEQ, on May 5, 2015 (Exhibit 7).

## V. In 2015, the Ohio EPA Issues Closed Loop a Notice of Violation for Operating an Air Contaminant Source Without a Permit.

34. After a January 27, 2015 site visit, on April 2, 2015, the Ohio EPA issued Closed Loop a Notice of Violation for operating an air contaminant source without a permit (Exhibit 8).

35. The April 2, 2015 Notice of Violation stated that the Ohio EPA had observed a "haze of fine dust outside the breaker room" on January 27, 2015 and that Closed Loop needed take steps "to reduce indoor air pollution outside the breaker enclosure."

36. The April 2, 2015 Notice of Violation further stated: "Pollutants that are outside the breaker room are free to vent outside the building through open loading doors or the buildings [sic] ventilation."

## VI. Also in 2015, OSHA Cites Closed Loop for Permitting an Accumulation of Lead in One of its Warehouses.

37. On April 16, 2015, the Columbus Area Office of the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") inspected and conducted air and surface sampling at the Closed Loop facility at 1675 Watkins Road, Columbus, Ohio.

38. OSHA issued a sampling data summary from that inspection on August 14, 2015 (Exhibit 9).

39. OSHA detected both lead and cadmium in excess of permitted levels in the glass breaking area.

40. OSHA issued a Citation and Notification of Penalty to Closed Loop on August 14, 2015 (Exhibit 9), noting over 26 "Serious" violations of federal regulations including 29 CFR 1910.1025(h)(1)'s requirement that surfaces be maintained as free as practicable of accumulations of lead.

41.     In a September 9, 2015 Notice of Contest to the August 14, 2015 citations (Exhibit 10), Closed Loop claimed that it "reduces lead on surfaces as much as is practicable," including "clean[ing] the plant completely once per year."

### VII.     Closed Loop Accumulates CRTs For Years Without Starting Construction of Its Furnace, Then Stops Paying Rent Before 2015.

42.     By June 2014, Ohio EPA regulators were expressing to Closed Loop their concern that Closed Loop could abandon large amounts of leaded glass if it was unable to obtain financing for a furnace (Exhibit 11).

43.     Closed Loop never obtained financing for its furnace, and never commenced construction of its furnace.

44.     By June 2014, Closed Loop stopped paying rent at its warehouse at 1675 Watkins Road, Columbus, Ohio (Exhibit 12).

45.     By January 2015, Closed Loop stopped paying rent at its warehouse at 1655 Watkins Road in Columbus, Ohio (Exhibit 13).

### VIII.    Closed Loop Procures The 2015 Policies by Representing it Had No Known Claims or Releases, and Knew of No Circumstances That Could Lead to Any.

46.     On June 4, 2014, Closed Loop issued a letter to its insurance broker, Willis of Arizona, Inc. ("Willis"), stating Closed Loop "[had] not had any losses or known losses" as of that date (Exhibit 14).

47.     Willis provided the no known loss letter to Aspen.

48.     On April 13, 2015, Closed Loop submitted a General Liability Environmental Exposure Facilities Application to Aspen (the "2015 Application," Exhibit 15).

49.     In the 2015 Application, Closed Loop represented that it had not been previously prosecuted for violating any law relating to the release or threatened release of hazardous waste,

had no claims against it for clean-up resulting from the release of hazardous waste, and had no knowledge of facts or circumstances which may reasonably be expected to result in a claim for environmental clean-up.

50.     Specifically, Closed Loop answered questions in the 2015 Application in relevant part as follows:

3.     During the last five years, has the applicant been prosecuted or is the applicant currently being prosecuted for contravention of any standard or law relating to the release or threatened release of a hazardous substance, hazardous waste or other pollutant as defined by applicable environmental regulations? If Yes, please provide the details:

No.

4.     List all claims made against the applicant during the past 5 years for clean-up or response action, "toxic tort" or other bodily injury or property damage, resulting from the release of hazardous substances, hazardous waste, or other pollutant, from this location or other locations owned operated by the applicant, into the environment. Provide a brief description of the claim(s) and their disposition:

[No response]

* * *

6.     At the time of signing this application, is the applicant's manager or supervisor responsible for environmental affairs, control or compliance or any officer, director or partner of the applicant aware of any facts or circumstances which may reasonably be expected to result in a claim or claims being asserted against the applicant for environmental cleanup, or for bodily injury or property damage arising from the release of pollutants into the environment?  If Yes, please provide the details:

No.

51.     Aspen issued to Closed Loop commercial general liability and environmental exposure insurance policy number ERA9VP115, effective April 12, 2015 through April 12, 2016 (the "2015 Environmental Policy"), and commercial environmental excess follow form policy number EXA9VP315, effective April 12, 2015 through April 12, 2016 (the "2015 Excess Policy") (the 2015 Environmental Policy and 2015 Excess Policy are collectively referred to as the "2015 Policies").

52.     Aspen issued the 2015 Policies based on the representations in the 2015 Application and the representations in the no known loss letter.

**IX.     After Procuring the 2015 Policies, Closed Loop is Sued Twice and Ceases Operations Before Applying for the 2016 Policies.**

53.     On August 3, 2015, warehouse owner Garrison Southfield Park LLC ("Garrison"), commenced litigation against Closed Loop, alleging that Closed Loop had failed to pay rent, and had abandoned 11 million pounds of CRTs and related materials at 1655 Watkins Road (Exhibit 13).

54.     Closed Loop continued to accept CRTs, and payment for its promise to recycle them, into 2016.

55.     On March 4, 2016, Garrison commenced a second lawsuit against Closed Loop, alleging that Closed Loop had failed to pay rent, and had abandoned "millions of pounds" of CRTs and related materials at 1675 Watkins Road (Exhibit 12).

56.     On April 11, 2016, the Ohio EPA issued a notice of violation regarding Closed Loop's speculative accumulation at another Columbus, Ohio warehouse, located at 2200 Fairwood Avenue, citing Closed Loop's lack of feasible means of recycling the CRTs (Exhibit 16).

57.     By the time the Ohio EPA issued its April 2016 notice of violation, Closed Loop had ceased operations.

58.     Specifically, by March 9, 2016, according to representations to OSHA by Closed Loop's attorney (Exhibit 17), "Closed Loop ha[d] ceased operations due to cash flow issues."

59.     By March 17, 2016, Closed Loop conceded to Garrison that it had been accumulating CRTs and leaded glass on the property for four years (Exhibit 18).

**X.     Closed Loop Procures The 2016 Policies Based On Representations That It Had No Known Claims or Releases, And Knew Of No Circumstances That Could Lead To Any.**

60.     On April 5, 2016, Closed Loop submitted a General Liability Environmental Exposure Facilities Application to Aspen (the "2016 Application," Exhibit 19).

61.     In the 2016 Application, Closed Loop represented that it had not been previously prosecuted for violating any law relating to the release or threatened release of hazardous waste, had no claims against it for clean-up resulting from the release of hazardous waste, and had no knowledge of facts or circumstances which may reasonably be expected to result in a claim for environmental clean-up.

62.     Specifically, Closed Loop answered questions in the 2016 Application as follows:

3.     During the last five years, has the applicant been prosecuted or is the applicant currently being prosecuted for contravention of any standard or law relating to the release or threatened release of a hazardous substance, hazardous waste or other pollutant as defined by applicable environmental regulations? If Yes, please provide the details:

No.

4.     List all claims made against the applicant during the past 5 years for clean-up or response action, "toxic tort" or other bodily injury or property damage, resulting from the release of hazardous substances, hazardous waste, or other pollutant, from this location or other locations owned operated by the applicant, into the environment. Provide a brief description of the claim(s) and their disposition:

[No response]

* * *

6.      At the time of signing this application, is the applicant's manager or supervisor responsible for environmental affairs, control or compliance or any officer, director or partner of the applicant aware of any facts or circumstances which may reasonably be expected to result in a claim or claims being asserted against the applicant for environmental cleanup, or for bodily injury or property damage arising from the release of pollutants into the environment?  If Yes, please provide the details:

No.

63.      Aspen issued to Closed Loop commercial general liability and environmental exposure insurance policy number ERA9VP116, effective April 12, 2016 through July 9, 2016 (the "2016 Environmental Policy") and commercial environmental excess follow form policy number EXA9VP316, effective April 12, 2016 through July 9, 2016[1] (the "2016 Excess Policy") (the 2016 Environmental Policy and 2016 Excess Policy are collectively referred to as the "2016 Policies").

64.      Aspen issued the 2016 Policies based on the representations in the 2016 Application and the representations in the no known loss letter.

## COUNT I – RESCISSION OF 2015 POLICIES

65.      Aspen repeats and realleges the allegations of Paragraphs 1 through 63 as if fully set forth herein.

66.      As detailed below, Closed Loop procured the 2015 Policies by providing false information and failing to disclose relevant and responsive information relating to existing and/or potential claims and releases in response to Questions 3, 4, and 6 on the 2015 Application, and through its no known loss letter.

---

[1] The 2016 Policies were cancelled effective July 9, 2016 due to non-payment of premiums.

**Question 3 on the 2015 Application**

67.    On April 13, 2015, Closed Loop responded "No" to Question 3 on the 2015 Application:  "During the last five years, has the applicant been prosecuted…for contravention of any standard or law relating to the release or threatened release of a hazardous substance, hazardous waste or other pollutant as defined by applicable environmental regulations?"

68.    When Closed Loop submitted the 2015 Application, Closed Loop was aware that within the last five years it had been prosecuted by both the Ohio EPA and Arizona DEQ for violating environmental regulations relating to the release or threatened release of hazardous waste, including knowing that it had:

   a.   Received the October 17, 2013 Notice of Violation letter from the Ohio EPA relating to violating Ohio law by, *inter alia*, storing hundreds of pallets of broken lead-containing CRTs outside in deteriorated boxes;

   b.   Entered into the June 10, 2014 Settlement Agreement with the Ohio EPA relating to the "release" of improperly stored, broken, lead-containing CRTs to the ground;

   c.   Received the October 3, 2014 Notice of Violation letter from the Arizona DEQ regarding the improper storage and accumulation of lead-containing CRTs;

   d.   Received a proposed Consent Order from the Arizona DEQ on December 11, 2014; and

   e.   Received the April 2, 2015 Notice of Violation from the Ohio EPA regarding "indoor air pollution" and permitting pollutants "to vent outside the building."

69.    Therefore, Closed Loop knew when it submitted the 2015 Application that it had been prosecuted for contravention of standards and laws relating to the release or threatened release of a hazardous substance, hazardous waste, or other pollutant in the prior five years.

12

70.     As such, Closed Loop's answer to Question 3 on the 2015 Application was false.

71.     Further, a reasonable applicant in Closed Loop's position would have naturally contemplated the Ohio EPA and Arizona DEQ's enforcement actions, including the Settlement Agreement and draft Consent Order, as being relevant and responsive when asked whether Closed Loop had been prosecuted for contravention of law relating to the release or threatened release of a hazardous substance or waste as defined by applicable environmental regulations.

72.     When Aspen issued the 2015 Policies, Aspen was not aware that that in the last five years Closed Loop had been prosecuted by both the Ohio EPA and Arizona DEQ for violating environmental regulations relating to the release or threatened release of hazardous waste as defined by applicable environmental regulations.

73.     Closed Loop's failure to truthfully answer Question 3 on the 2015 Application was fraudulent and material to Aspen's agreement to issue the 2015 Policies to Closed Loop on the terms they were issued.

**Question 4 on the 2015 Application**

74.     On April 13, 2015, Closed Loop failed to make any disclosures in response to Question 4 on the 2015 Application:  "List all claims made against the applicant during the past 5 years for clean-up or response action, 'toxic tort' or other bodily injury or property damage, resulting from the release of hazardous substances, hazardous waste, or other pollutant, from this location or other locations owned operated by the applicant, into the environment."

75.     When Closed Loop submitted the 2015 Application, Closed Loop was aware that within the previous five years it had received claims for clean-up or response action resulting from the alleged release of hazardous substances, hazardous waste, or other pollutants into the environment, including that it had:

a. Received the October 17, 2013 Notice of Violation letter from the Ohio EPA relating to violating Ohio law by, *inter alia*, storing hundreds of pallets of broken lead-containing CRTs outside in deteriorated boxes;

b. Entered into the June 10, 2014 Settlement Agreement with the Ohio EPA relating to the "release" of improperly stored, broken, lead-containing CRTs to the ground;

c. Received the October 3, 2014 Notice of Violation letter from the Arizona DEQ regarding the improper storage and accumulation of lead-containing CRTs;

d. Received a proposed Consent Order from the Arizona DEQ on December 11, 2014; and

e. Received the April 2, 2015 Notice of Violation from the Ohio EPA regarding "indoor air pollution" and permitting pollutants "to vent outside the building."

76. Therefore, Closed Loop knew when it submitted the 2015 Application that it had received claims for clean-up or response action resulting from the alleged release of hazardous substances, hazardous waste, or other pollutants into the environment in the prior five years.

77. As such, Closed Loop's failure to answer Question 4 on the 2015 Application was a misrepresentation and concealment of facts.

78. Further, a reasonable applicant in Closed Loop's position would have naturally contemplated the Ohio EPA and Arizona DEQ's enforcement actions and the subsequent Settlement Agreement and Consent Order as relevant and responsive when asked to list all claims made against Closed Loop during the past five years for clean-up or response action resulting from the release of hazardous substances, hazardous waste, or other pollutants into the environment.

79.     When Aspen issued the 2015 Policies, Aspen was not aware that within the previous five years, the Ohio EPA and Arizona DEQ stated claims against Closed Loop for clean-up or response action relating to alleged hazardous waste.

80.     Closed Loop's failure to truthfully answer Question 4 on the 2015 Application was fraudulent and material to Aspen's agreement to issue the 2015 Policies to Closed Loop on the terms they were issued.

### <u>Question 6 on the 2015 Application</u>

81.     On April 13, 2015, Closed Loop responded "No" to Question 6 on the 2015 Application:  "At the time of signing this application, is…any officer, director or partner of the applicant aware of any facts or circumstances which may reasonably be expected to result in a claim or claims being asserted against the applicant for environmental cleanup…or property damage arising from the release of pollutants into the environment?"

82.     In fact, Closed Loop's officers and directors were aware of facts or circumstances which may reasonably be expected to result in a claim being asserted against Closed Loop for environmental cleanup or property damage, including:

a.      Closed Loop had created large, uncovered piles of leaded CRT glass outside at least one warehouse in Phoenix, Arizona;

b.      Closed Loop was speculatively accumulating millions of pounds of CRTs in both Arizona and Ohio – for which it had no furnace and no other feasible end market – under conditions that could lead to releases (and which accumulation warehouse owners contend is a release in and of itself); and

c.   Closed Loop was releasing uncontained lead dust during its glass crushing operations, in violation of Occupational Safety and Health Administration (OSHA) laws and environmental regulations.

83.   Therefore, Closed Loop knew when it submitted the 2015 Application that there were facts and circumstances which may reasonably be expected to result in a claim against Closed Loop for environmental cleanup or property damage arising from the release of pollutants into the environment.

84.   As such, Closed Loop's answer to Question 6 on the 2015 Application was false.

85.   A reasonable applicant in Closed Loop's position would have naturally contemplated the existing outdoor piles of leaded glass, speculative accumulation of improperly stored CRTs and related materials, and release of lead dust as relevant and responsive when asked to list facts or circumstances which could give rise to a claim.

86.   When Aspen issued the 2015 Policies, Aspen was not aware that Closed Loop had created piles of leaded glass outside, was speculatively accumulating improperly stored CRTs and related materials in Arizona and Ohio, and was releasing lead dust into and potentially outside its warehouses in Arizona and Ohio.

87.   Closed Loop's failure to truthfully answer Question 6 on the 2015 Application was fraudulent and material to Aspen's agreement to issue the 2015 Policies to Closed Loop on the terms they were issued.

**No Known Loss Letter**

88.   Closed Loop issued the known loss letter indicating it had not suffered and did not know of any losses on or before June 4, 2014.

16

89.     In fact, when Closed Loop issued the known loss letter, it knew that it had suffered a loss, including the $2,200 fine imposed in the June 10, 2014 Settlement Agreement with the Ohio EPA as a result of the Ohio EPA's enforcement action, which resulted in a fine against Closed Loop.

90.     Therefore, Closed Loop's declaration in the known loss letter was false.

91.     Further, a reasonable applicant in Closed Loop's position would have naturally contemplated the findings and enforcement action by the Ohio EPA as a loss when representing to its insurer that it had no losses or known losses.

92.     When Aspen issued the 2015 Policies, Aspen was not aware that Closed Loop had suffered a loss as a result of the Ohio EPA's investigations on and around September 30, 2013, which related to the improper storage of CRTs.

93.     Closed Loop's failure to truthfully disclose its loss history was fraudulent and material to Aspen's agreement to issue the 2015 Policies to Closed Loop on the terms they were issued.

94.     When answering Question 3, 4 and 6 on the 2015 Application and issuing the no known loss letter, Closed Loop knew its answers, statements, and/or representations were false and intended to deceive Aspen with regards to the information requested in response to the 2015 Application and provided within the no known loss letter.

95.     When Aspen issued the 2015 Policies, Aspen did not have actual knowledge, nor did it receive inquiry notice, of the true facts relating to the above-stated misrepresentations.

96.     Closed Loop's concealment of the facts stated above deprived Aspen of its ability to accurately evaluate the risks that it insured under the 2015 Policies.

97.     Aspen would have precluded coverage for Closed Loop's CRT-related operations or not issued the 2015 Policies at all had it known that in the prior five years Closed Loop had been repeatedly prosecuted, received multiple claims and known losses, was speculatively accumulating improperly-stored CRTs in its warehouses and in uncovered outdoor piles, and was releasing uncontained lead dust during its CRT-breaking operations.

98.     Aspen will be prejudiced if the 2015 Policies are not rescinded and declared void *ab initio*.

99.     Closed Loop's failure to disclose the Ohio EPA and Arizona DEQ enforcement actions, the claims and notices of violations issued by the Ohio EPA and Arizona DEQ, and the facts and circumstances surrounding their speculative accumulation of improperly-stored CRTs and release of lead dust constitutes a fraudulent, material misrepresentation sufficient to grant rescission of an insurance policy under Arizona Revised Statues § 20-1109.

100.     Equity requires that Closed Loop's fraudulent misrepresentations regarding the Ohio EPA and Arizona DEQ enforcement actions, the claims and notices of violations issued by the Ohio EPA and Arizona DEQ, their speculative accumulation of improperly-stored CRTs, and release of lead dust preclude Aspen from having, and estops Closed Loop or any other person or entity from asserting that Aspen has, any potential duty to defend or indemnify that person or entity under the 2015 Policies.

## COUNT II – RESCISSION OF 2016 POLICIES

101.     Aspen repeats and realleges the allegations of Paragraphs 1 through 100 as if fully set forth herein.

102.     Closed Loop provided false information and failed to disclose relevant and responsive information relating to existing and/or potential pollution claims in response to

Questions 3, 4, and 6 on the 2016 Application, and through its no known loss letter, in all the ways listed in Count I.

103.   After it submitted the 2015 Application but before it submitted the 2016 Application on April 5, 2016, Closed Loop was prosecuted again for contravention of a standard or law relating to the release or threatened release of a hazardous substance, hazardous waste, or other pollutant as defined by applicable environmental regulations when it received the April 11, 2016 Ohio EPA Notice of Violation and as reflected by its entry into a Consent Order with the Arizona DEQ on May 5, 2015.

104.   After it submitted the 2015 Application but before it submitted the 2016 Application on April 5, 2016, at least two more claims were made against Closed Loop for clean-up or response action resulting from the alleged release of hazardous substances, hazardous waste, or other pollutants – Garrison's August 3, 2015 and March 4, 2016 lawsuits.

105.   After it submitted the 2015 Application but before it submitted the 2016 Application on April 5, 2016, Closed Loop became aware of additional facts and circumstances which may reasonably be expected to result in a claim or claims for environmental cleanup arising from the release of pollutants, including that it had formally entered into a Consent Order with the Arizona DEQ on May 5, 2015, and had ceased operations and abandoned in at least four warehouses in two states large quantities of improperly-stored CRTs under conditions that could lead to releases (and which accumulation warehouse owners contend is a release in and of itself).

106.   Closed Loop's answers to Questions 3, 4, and 6 on the 2016 Application were false for the same reasons its answers on the 2015 Application were false, and for the additional reasons noted herein.

107.    A reasonable applicant in Closed Loop's position would have naturally contemplated the prosecutions, claims, and facts and circumstances listed above when asked Questions 3, 4, and 6 on the 2016 Application.

108.    Aspen was not aware, when it issued the 2016 Policies, that Closed Loop had received the April 11, 2016 Ohio EPA Notice of Violation, entered into a Consent Order with the Arizona DEQ on May 5, 2015, been sued by Garrison on August 3, 2015 and March 4, 2016 lawsuits, and had ceased operations and abandoned in at least four warehouses in two states large quantities of improperly-stored CRTs under conditions that could lead to releases (and which accumulation warehouse owners contend is a release in and of itself).

109.    Closed Loop's failure to truthfully answer Questions 3, 4, and 6 on the 2016 Application was fraudulent and material to Aspen's agreement to issue the 2016 Policies to Closed Loop on the terms they were issued.

110.    When answering Questions 3, 4 and 6 on the 2016 Application, Closed Loop knew its answers were false and intended to deceive Aspen with regards to the information requested in response to the 2016 Application.

111.    When Aspen issued the 2016 Policies, Aspen did not have actual knowledge, nor did it receive inquiry notice, of the true facts relating to the above-stated misrepresentations.

112.    Closed Loop's concealment of the facts stated above deprived Aspen of its ability to accurately evaluate the risks that it insured under the 2016 Policies.

113.    Aspen would have precluded coverage for Closed Loop's CRT-related operations or not issued the 2016 Policies at all had it known that in the prior five years Closed Loop had been repeatedly prosecuted, received multiple claims and known losses, was speculatively

accumulating improperly-stored CRTs in its warehouses and in uncovered outdoor piles, had released uncontained lead dust during its CRT-breaking operations, and had ceased operations.

114.    Aspen will be prejudiced if the 2016 Policies are not rescinded and declared void *ab initio*.

115.    Closed Loop's failure to disclose the Ohio EPA and Arizona DEQ enforcement actions, the claims and notices of violations issued by the Ohio EPA and Arizona DEQ enforcement, and the facts and circumstances surrounding their speculative accumulation of CRTs and release of lead dust constitutes a fraudulent, material misrepresentation sufficient to grant rescission of an insurance policy under Arizona Revised Statues § 20-1109.

116.    Equity requires that Closed Loop's fraudulent misrepresentations regarding the Ohio EPA and Arizona DEQ enforcement actions, the claims and notices of violations issued by the Ohio EPA and Arizona DEQ enforcement, and the facts and circumstances surrounding their speculative accumulation of CRTs and release of lead dust preclude Aspen from having, and estops Closed Loop or any other person or entity from asserting that Aspen has, any potential duty to defend or indemnify that person or entity under the 2016 Policies.

WHEREFORE, Aspen requests a judgment in its favor against Closed Loop, on all Counts of Aspen's Complaint for Rescission, including the following relief:

    a. A declaration that the 2015 and 2016 Policies are subject to rescission, are rescinded, and are void *ab initio*;

    b. A declaration that Aspen has no duty to defend or indemnify in relation to any litigation or other claim, under the 2015 and 2016 Policies; and

    c. Any such other and further relief as this Court deems just and appropriate.

1

## **DEMAND FOR JURY TRIAL**

2

3        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Aspen demands trial by jury

4   in this action of all issues so triable.

5                                                           DATED this 31st day of May, 2018

6                                                           _s/ Christopher D. Blum_____
                                                             Attorneys for Plaintiff
7                                                           Aspen Specialty Insurance Company

8                                                           Matthew J. Fink (*Pro Hac Vice* Forthcoming)
9                                                           Amy Collins Cassidy (*Pro Hac Vice* Forthcoming)
                                                             Christopher D. Blum (*Pro Hac Vice* Forthcoming)
10                                                          NICOLAIDES FINK THORPE
                                                             MICHAELIDES SULLIVAN LLP
11                                                          10 South Wacker Drive, Suite 2100
12                                                          Chicago, IL 60606
                                                             Ph:  312-585-1400
13                                                          Fax: 312-585-1401
14                                                          mfink@nicloaidesllp.com
                                                             acassidy@nicolaidesllp.com
15                                                          cblum@nicolaidesllp.com

16

17

18

19

20

21

22

23

24

25

26

27

28